Matthew T. Findley, ABA #0504009
Michael S. Schechter, ABA #1405044
ASHBURN & MASON, P.C.
1227 W. Ninth Ave., Suite 200
Anchorage, Alaska 99501
907-276-4331
matt@anchorlaw.com
mike@anchorlaw.com

*Attorneys for Plaintiff Alaska Industrial Development and Export Authority*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ALASKA INDUSTRIAL DEVELOPMENT AND EXPORT AUTHORITY, <br><br>             Plaintiff, <br><br>     v. <br><br> BUREAU OF LAND MANAGEMENT; UNITED STATES DEPARTMENT OF THE INTERIOR; DEB HAALAND, in her official capacity as Secretary of the Interior; and TRACY STONE-MANNING, in her official capacity of Director of the Bureau of Land Management, <br><br>             Defendants. | Case No. 3:24-cv-_____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

(Alaska National Interest Lands Conservation Act, 16 U.S.C. §§ 3101 *et seq.*;
National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*;
Administrative Procedure Act, 5 U.S.C. §§ 702–706;
Tax Cuts and Jobs Act of 2017 Pub. L. 115-97 § 2001)

COMPLAINT
*Alaska Industrial Development & Export Authority v. Bureau of Land Management*, *et al.* Case No. 3:24:cv_____
Page **1** of **52**

Case 3:24-cv-00282   Document 1   Filed 12/20/24   Page 1 of 52

Plaintiff Alaska Industrial Development and Export Authority ("AIDEA") a public corporation of the state and a political subdivision of the State of Alaska, with delegated authority to, and charged with "promoting the health, security, and general welfare of all the people of the state" by the laws of Alaska,[1] by and through undersigned counsel, alleges and pleads as follows:

## INTRODUCTION

1.      AIDEA challenges the 2024 Coastal Plain Oil and Gas Leasing Program Record of Decision ("2024 ANWR Lease Sale ROD" or "2024 ROD") issued by the Department of Interior ("DOI") Bureau of Land Management ("BLM") on December 9, 2024, selecting Alternative D2 from the November 2024 Arctic National Wildlife Refuge ("ANWR") Lease Sale Final Supplemental Environmental Impact Statement ("2024 SEIS"). The 2024 ROD sets forth the acreage available for leasing and terms and conditions associated with that acreage for the second ANWR Coastal Plan Lease Sale mandated by the 2017 Tax Cuts and Jobs Act ("2017 Tax Act"). The ROD violates the 2017 Tax Act and a myriad of other laws because it: (1) improperly prevents development of acreage in the ANWR Coastal Plain known to have the highest concentration of economically recoverable hydrocarbon deposits; and (2) the 2024 SEIS it is based on is fundamentally flawed. AIDEA brings this action to vacate the 2024 ANWR Lease Sale ROD, halt the pending illegal lease sale, which BLM recently advertised in a Notice of Sale published in

---

[1] AS 44.88.010; AS 44.88.020; and AS 44.88.080.

the Federal Register on December 10, 2024, and seek an order compelling BLM to conduct a lease sale in the manner mandated by Congress in both the 2017 Tax Act and the Alaska National Interest Lands Conservation Act ("ANILCA").

2.      The future of oil and gas development in ANWR's Coastal Plain (also known as Area 1002) has long been the subject of contentious political debate both within Alaska and nationally. Congress put this issue to rest when it passed the 2017 Tax Act, expressly directing the BLM to facilitate the development of oil and gas resources on the Coastal Plain ("ANWR Lease Program" or "Leasing Program") by awarding leases for the production of hydrocarbons and taking additional steps to further the Leasing Program.[2] The 2017 Tax Act explicitly required BLM to conduct at least two lease sales. BLM initially complied with this Congressional directive and conducted the first lease sale on January 6, 2021, where AIDEA was the winning bidder for the majority of the offered acreage and BLM issued seven leases to AIDEA in early January 2021.

3.      On January 20, 2021, a new administration was sworn in and BLM radically changed course, defying Congress's earlier decision to open the Coastal Plain to oil and gas leasing. The reason is obvious: the then new administration was opposed to oil and gas development in ANWR. However, a new presidential administration cannot defy prior acts of Congress it disagrees with or simply does not like. The rule of law requires executive agencies to abide by Congressional enactments unless and until they are revised by a

---

[2] P.L 115-97 ("2017 Tax Act") § 20001.

subsequent act of Congress or struck down by the courts. Instead of abiding by this bedrock Constitutional principle, BLM has embarked on a lawless campaign to block any oil and gas development in ANWR's Coastal Plain. First, BLM illegally and arbitrarily suspended the seven leases BLM had awarded AIDEA in 2021, less than a year after it issued the leases. BLM then cancelled the leases outright in 2023, intending to negate what had been the first required lease sale. AIDEA is now challenging this illegal lease cancellation in a separate action.

4.    Next, BLM attempted to circumvent the Congressional requirement in the 2017 Tax Act to hold a second ANWR lease sale by December 22, 2024.[3] It embarked on an unnecessary and flawed Supplemental Environmental Impact Statement ("SEIS") process designed to place as many roadblocks to development as possible under the guise of conservation concerns. Consistent with this pretense, BLM issued a final supplemental EIS on November 5, 2024 ("2024 SEIS") listing a preferred alternative that essentially re-listed the same acreage that AIDEA had successfully bid on in the first lease sale. BLM's preferred alternative places onerous and arbitrary development restrictions on significant portions of acreage which will stifle potential development of the mineral resources, the opposite of what Congress instructed.[4] Indeed, by BLM's own analysis, its new preferred alternative would result in only .4 billion barrels of oil produced from the leased area

---

[3] 2017 Tax Act § 20001(c)(1)(B)(ii)(II).
[4] 2017 Tax Act § 20001.

whereas the preferred alternative chosen in 2021 provided for 1.9 billion barrels of producible oil. Even worse, BLM is offering this constrained lease sale *largely comprised of land already leased to AIDEA* and subject to the ongoing litigation regarding this lawless cancellation. In fact, *over 70 percent* of the acreage that BLM had declared available for its purported second lease sale has already been leased to AIDEA.

5.    BLM's 2024 ANWR Lease Sale ROD is in direct defiance of the 2017 Tax Act. Accordingly, it must be vacated and any leases issued thereunder suspended until BLM corrects the legal deficiencies and proposes a lease sale that complies with the Act. There is no credible argument that placing restrictions on acreage subject to lease that effectively prevents development of these leases complies with Congress's mandate to open the Coastal Plain to oil and gas leasing and generate revenue for the treasury to cover the costs of the 2017 Tax Act. Nor can BLM take cover and argue that the conservation concerns alleged in the 2024 SEIS justify its decision to place onerous restrictions on the acreage subject to lease. The 2017 Tax Act mandates development and provides no room for conservation concerns to override the mandate.

6.    In short, BLM is attempting to defy Congress and unilaterally nullify a Congressional enactment to provide for oil and gas leasing in ANWR's Coastal Plain. BLM's efforts to stymie Coastal Plain development to the point of creating a *de facto* development ban must be halted. AIDEA respectfully requests that the 2024 ANWR Lease Sale ROD be vacated in its entirety, the pending lease sale be enjoined, and BLM ordered

to conduct a lease sale in accordance with the 2017 Tax Act. This result is in accord with Congressional intent, the best interests of the Alaskan people, and the viewpoints of those who live near or within the Refuge. In a recent Op-Ed, longtime Kaktovik resident and former president of the Kaktovik Iñupiat Corporation stated in response to BLM's decision "Despite our strong and clearly communicated desire to realize the potential of our homelands as promised by Congress, the U.S. Department of Interior is essentially wiping us off the map by preventing us from managing our own land and resources."[5]

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this action by virtue of 28 U.S.C. § 1331 (action arising under the laws of the United States), 28 U.S.C. § 1346 (civil action against the United States founded upon the Constitution, an Act of Congress, or an executive regulation), 28 U.S.C. § 1361 (action to compel officer or agency to perform duty owed to Plaintiff), 43 U.S.C. §§ 1701-1784 (FLPMA), and 5 U.S.C. §§ 701-706 (Administrative Procedure Act). An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 705-706.

8. This Court has personal jurisdiction over the individual defendants by virtue of 28 U.S.C. § 1391(e) because the property that is the subject of this action is situated in

---

[5] Charles Lampe, *Indigenous rights disregarded in latest ANWR decision*, Anchorage Daily News, Dec. 19. 2024, https://www.adn.com/opinions/2024/12/18/indigenous-rights-disregarded-in-latest-anwr-decision/

COMPLAINT
*Alaska Industrial Development & Export Authority v. Bureau of Land Management, et al.* Case No. 3:24:cv_____

this district and because the individual defendants are officers and employees of an agency of the United States and are being named in their official capacity.

9.      This Court has jurisdiction over defendants the Department of the Interior and the Bureau of Land Management pursuant to 5 U.S.C. § 702.

10.     Pursuant to 28 U.S.C. § 1391(e) venue is proper in this Court because the lands subject to this dispute are located in this district.

11.     This matter is timely pursuant to 28 U.S.C. § 2401 because the first decision being appealed is dated December 9, 2024.

12.     BLM's Issuance of the 2024 ANWR Lease Sale ROD on December 9, 2024 is a final agency decision subject to judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 – 706, and constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court."[6]

13.     An actual controversy presently exists between the parties concerning the validity of various BLM actions. That controversy is justiciable in character, and speedy relief is needed to preserve plaintiff's rights.

14.     A declaratory judgment will terminate the uncertainty and controversy between the parties.

## **PARTIES**

15.     AIDEA is a public corporation of the State of Alaska (AS 44.88.010). It was

---

[6] 5 U.S.C. §§ 551(4), (13).

COMPLAINT
*Alaska Industrial Development & Export Authority v. Bureau of Land Management*, *et al.* Case No. 3:24:cv_____
Page **7** of **52**

created in 1967 by the Alaska Legislature "in the interests of promoting the health, security, and general welfare of all the people of the state, and a public purpose, to increase job opportunities and otherwise to encourage the economic growth of the state, including the development of its natural resources, through the establishment and expansion of manufacturing, industrial, energy, export, small business, and business enterprises…" AIDEA's mission is to provide various means of financing to promote economic growth and diversity. AIDEA accomplishes its mission by, among other things, facilitating the financing of industrial, manufacturing and energy facilities, infrastructure, commercial real estate, and equipment within the state. AIDEA also has the authority to own and operate facilities that advance this goal. Since inception, AIDEA's financing has served all regions in Alaska by helping to create thousands of jobs and paying over $506 million in dividends to the State's General Fund.

16.     The ANWR Lease Program is extremely important to AIDEA, its local partners on the North Slope, Alaska, and the Nation as a whole. This is particularly true given the significant developmental benefits and economic opportunities the Program presents for Alaskans and the significant energy security benefit the Program offers to all Americans. As the major leaseholder in the Program (until the illegal cancelation of its leases), AIDEA has been highly involved with the development of the Leasing Program thus far, participating in the public comment period for the original Environmental Impact Statement and all phases of NEPA review. AIDEA is also a likely bidder on all further

lease sales.

17.     DOI is an agency of the United States charged with overseeing public lands, including issuing the decisions appealed in this action.

18.     Defendant BLM is an agency of the DOI.

19.     Defendant Deb Haaland is Secretary of the Department of the Interior for the United States and is named as a defendant in that official capacity.

20.     Defendant Tracy Stone-Manning is the Director of BLM and is named as a defendant in that official capacity.

## FACTS GIVING RISE TO THIS LAWSUIT

### A.     ANWR History and Estimated Petroleum Reserves

21.     Alaska is a resource development state. The Alaska economy is largely dependent on resource extraction and a significant majority of the State's revenue is derived from resource development. Indeed, control over Alaska's lands and resources was the driving force behind statehood.[7] One longstanding resource development issue has

---

[7] *E.g., Metlakatla Indian Community v. Egan*, 369 U.S. 45, 47 (1962); *Pullen v. Ulmer*, 923 P.2d 54, 57 n. 5 (Alaska 1996); *see also* Alaska Legislative Affairs Agency, Alaska's Constitution: A Citizen's Guide (5th ed. 2002) at https://akleg.gov/docs/pdf/citizens_guide.pdf (Many Alaskans concluded "that the notion of the federal government's superior vigilance as a trustee of the public interest was really a cloak for the institutional interests of bureaucrats and the economic interests of nonresident corporations exploiting those resources (principally Seattle and San Francisco salmon canning companies []).");  HOUSE COMM. ON INTERIOR AND INSULAR AFFAIRS, Act Providing for the Admission of the State of Alaska into the Union of 1957, H.R. REP. No 85-624 (1958) (The Statehood Act "will enable Alaska to achieve full equality with existing States, not only in a technical juridical sense, but in practical

been following through on prior federal promises to open a small portion of ANWR (the Coastal Plain or Area 1002) to oil and gas leasing and development.

22.     ANWR consists of 19 million acres in northeast Alaska administered by the United States Fish and Wildlife Service ("FWS"). It was originally established in 1960 by President Dwight D. Eisenhower as a federally protected area comprised of 8.9 million acres. ANWR was expanded and established as a refuge under the Alaska National Interest Lands Conservation Act ("ANILCA"), which was intended to both "provid[e] sufficient protection for the national interest in the scenic, natural, cultural and environmental values on the public lands in Alaska" *and* "provid[e] adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people."[8] ANILCA set aside 104 million acres of land in Alaska for preservation purposes, including designating a portion of the Refuge as wilderness and, in Section 1002, it required a study of another portion— the 1.57-million-acre Coastal Plain (also referred to as Area 1002)—to assess its wildlife and potential impacts of oil and gas development.[9]

23.     Area 1002 is the most promising oil and gas prospect on the North Slope of Alaska that has yet to be adequately explored and delineated. DOI and BLM have actively studied the resource potential in Area 1002 for over thirty years. Following the enactment

---

economic terms as well. It does this by making the new State master in fact of most of the natural resources within its boundaries . . . .").

[8] *Sturgeon v. Frost* (*Sturgeon II*), 139 S. Ct. 1066, 1075 (2019).

[9] Pub. L. 96-487 §§ 1002, 1005-1006.

of ANILCA, the DOI conducted biological and geological studies of the 1002 area. This led to the development of the 1987 ANWR Coastal Plain Resource Assessment prepared by the FWS in collaboration with the United State Geological Survey ("USGS") and BLM. This report was the culmination of 5 years of biological baseline studies, surface geological studies, and two seasons of seismic exploration surveys. At the time of the report, geologists rated the ANWR coastal plain as the most promising onshore oil and gas exploration area in the United States.

24.     Following DOI's 1987 ANWR Resource Assessment, the USGS conducted its first geological assessment of petroleum potential in 1998 called *Arctic National Wildlife Refuge, 1002 Area, Petroleum Assessment, 1998, Including Economic Analysis*. The assessment estimated a mean value of 10.4 billion barrels of technically recoverable oil (USGS, 1998). In 2005, the USGS published an update called *Undiscovered Oil Resources in the Federal Portion of the 1002 Area of the Arctic National Wildlife Refuge: an Economic Update*. The geological assessment breaks down the mean value of technically recoverable oil by play type and accounts for updated economic information including incremental costs associated with finding, developing, producing, and transporting oil to market (USGS, 2005). The updated assessment estimates a mean value of 7.7 billion barrels of technically recoverable oil (10.4 billion barrels including Native lands and adjacent waters) and 3.5 trillion cubic feet of gas. The USGS has not provided an update to the economics of Area 1002 since 2005.

25.    Consistent with these prior findings, the 2024 SEIS also breaks down the estimated oil in place by play type.[10] The 2024 SEIS estimates a mean value of 7.69 billion barrels of technically recoverable oil and 7.04 trillion cubic feet of technically recoverable natural gas.[11] The 2024 SEIS delineates the Coastal Plain between an undeformed area (predominantly in the northwest corner), and the deformed area, explaining that 80 percent of the petroleum reserves are expected to be found in the undeformed area.[12]

## B.    The Congressional Decision in the 2017 Tax Act to Open the ANWR Coastal Plain to Oil and Gas Leasing and Exploration

26.    In December 2017, Congress enacted the 2017 Tax Act which included provisions opening the Coastal Plain Area 1002 to oil and gas leasing.[13] The statute directs the Secretary of the Interior, acting through the BLM, to establish and administer a competitive program for the leasing, development, production, and transportation of oil and gas in and from ANWR's Coastal Plain.[14] Specifically, it mandates BLM "establish and administer a competitive oil and gas program for the leasing, development, production,

---

[10] Bureau of Land Management, et al., *Coastal Plain Oil and Gas Leasing Program Supplemental Environmental Impact Statement* (Nov. 8, 2024) ("2024 SEIS") at Appendix C-5.

[11] 2024 FEIS ES-6.

[12] 2024 FEIS Appendix B-26.

[13] 2017 Tax Act § 20001.

[14] Although the Refuge as a whole is administered by FWS, under the Mineral Leasing Act of 1920 ("MLA"), 30 U.S.C. §§ 181 *et seq*., BLM manages onshore federal energy and mineral resources, not only on its own lands but also on those of other federal agencies.

Case 3:24-cv-00282    Document 1    Filed 12/20/24    Page 12 of 52

and transportation of oil and gas in and from the Coastal Plain" of ANWR,[15] and requires

BLM to conduct at least two 400,000-acre Coastal Plain lease sales by December 22, 2024,

with the first sale to be completed by December 22, 2021 and the second by December 22,

2024.[16] It also requires BLM to "issue any rights- of-way or easements across the Coastal

Plain for the exploration, development, production, or transportation necessary to carry out

this section,"[17] and to "authorize up to 2,000 surface acres of Federal land on the Coastal

Plain to be covered by production and support facilities...." [18] For context, 2,000 acres is

0.01% of ANWR's 19.3 million acres.

27.     The statute further instructs BLM to manage the ANWR Leasing Program

in a manner similar to the administration of lease sales under the Naval Petroleum Reserves

Production Act of 1976 ("NPRPA").[19] It also provides that Section 1003 of ANILCA,

which prohibits oil and gas development in ANWR unless authorized by Congress, shall

not apply to the Refuge's Coastal Plain,[20] and further amends ANILCA to add a fifth

---

[15] 2017 Tax Act § 20001(b)(2)(A).

[16] *Id. at* § 20001(c)(1).

[17] *Id.* at § 20001(c)(2).

[18] *Id.* at § 20001(c)(3).

[19] *Id.* at § 20001(b)(3). The NPRPA provides for a competitive oil and gas leasing in the National petroleum Reserve Alaska ("NPR-A"). 42 U.S.C. §§ 6501 *et seq.* The regulatory framework for the NPR-A (43 C.F.R. §§ 3130, 3137, 3150, 3152, and 3170) includes requirements for leasing terms, bonding, environmental obligations, and other issues associated with oil and gas development.

[20] *Id.* at 20001(b)(1)

purpose for ANWR – "to provide for an oil and gas program on the Coastal Plain."[21]

28.    The Congressional Budget Office estimated that the ANWR provisions in the 2017 Tax Act, along with other oil and gas provisions in that title, would increase net offsetting receipts by about $1.1 billion for the FY2018-2027 period.[22]

**C.    BLM's Initial Lease Sale and AIDEA's Leases**

29.    After passage of the 2017 Tax Act, BLM started the NEPA process to examine potential environmental impacts of a competitive oil and gas program on the coastal plain. BLM completed the NEPA review in September 2019, issuing the final EIS ("2019 FEIS"). The 2019 FEIS reviewed the Leasing Program's environmental impacts, addressed alternatives BLM could have taken to implement the Congressionally mandated program, and evaluated the Leasing Program's compliance with other statutes, such as requirements under ANILCA to assess impacts that the Leasing Program may have on subsistence hunting and fishing uses of the Coastal Plain under Section 810.[23]

---

[21] *Id.* at 20001(b)(v)

[22] Congressional Research Service, *Arctic National Wildlife Refuge (ANWR) Provisions in P.L 115-97, Tax Cuts and Jobs Act* (Feb 21, 2018), https://crsreports.congress.gov/product/pdf/IF/IF10782/9.

[23] Bureau of Land Management, et al., *Coastal Plain Oil and Gas Leasing Program Record of Decision* (Aug. 2020) ("2020 ROD") at 16 ("This Decision is constructed to provide for the protection of important surface resources and uses thereof, such as caribou (especially the Porcupine herd), polar bears, migratory birds, surface waters, and subsistence uses, among other resources and uses, and to take into account the other, non-oil and gas purposes of the ANWR, which include conservation of fish and wildlife populations and habitats, fulfillment of international treaty obligations, allowance for continued subsistence

COMPLAINT

*Alaska Industrial Development & Export Authority v. Bureau of Land Management*, *et al.* Case No. 3:24-cv_____

30.     The 2019 FEIS examined the potential impacts of four action alternatives, Alternative B (selected as the Preferred Alternative), Alternative C, Alternative D1, and Alternative D2.[24]

31.     Under Alternative B approximately 1,563,500 acres would be eligible for the lease sale (the entire program area), with 359,400 acres subject to no surface occupancy limitations and an additional 585,400 acres subject to timing limitations.[25] Thus, under Alternative B roughly 59 percent of the acres offered for lease were protected by either timing limitations or no surface occupancy limitations.[26]

32.     The 2019 FEIS also considered more restrictive alternatives. Alternative C considered the same total acres for lease sale as Alternative B, but 80 percent of the acres offered would be subject to no surface occupancy or timing limitations.[27] Alternative D1 considered offering fewer total acres for the lease sale (approximately 1,037,200 acres) of which 80 percent would be subject to no surface occupancy or timing limitations.[28] Under Alternative D2 only 800,000 acres would be available for the lease sale, all of which would

---

use, and protection of water quality and quantity necessary to meet fish and wildlife conservation needs.").

[24] Bureau of Land Management, et al., *Coastal Plain Oil and Gas Leasing Program Final Environmental Impact Statement* (Sept. 2019) ("2019 FEIS"), ES-3 through ES-5.

[25] 2019 FEIS ES-3

[26] 2019 FEIS ES-3.

[27] 2019 FEIS ES-3.

[28] 2019 FEIS ES-3–4.

be subject to limitations including no surface occupancy, timing limitations, or controlled surface use.[29]

33.    The 2019 FEIS noted its purpose was to inform BLM's determination regarding the establishment of an oil and gas program through a lease sale in accordance with the 2017 Tax Act.[30] With that backdrop in mind BLM in its 2020 ROD selected Alternative B explaining that "[i]n addition to applicable lease stipulations, several [Required Operating Procedures] would apply to post-lease oil and gas activities to reduce potential impacts."[31]

34.    BLM's selection of Alternative B was consistent with the Congressional directive to establish a competitive oil and gas program. Alternative B allowed the greatest potential acreage for the lease sale, while keeping guardrails in place to protect against unnecessary environmental harm.

35.    BLM followed the 2019 FEIS with its Record of Decision published in August 2020 ("2020 ROD") finalizing the structure of the Coastal Plain Leasing Program.[32] Similar to the 2019 FEIS, the 2020 ROD recognized the potential environmental impacts of the different action alternatives.[33] BLM determined that in

---

[29] 2019 FEIS ES-4. Alternative D2 in the 2019 FEIS was entirely different from Alternative D2 in the 2024 Final SEIS.

[30] 2019 FEIS at ES-1.

[31] 2019 FEIS at ES-3.

[32] *See generally* 2020 ROD.

[33] 2020 ROD at 15–16.

accordance with the 2017 Tax Act Alternative B was the best option as it would provide flexibility to develop the resource while also maintaining safeguards for conservation of fish and wildlife populations and habitats, continued subsistence use, protection of water quality and fulfillment of international treaty obligations.[34]

36.     The 2020 ROD was vetted by multiple career attorneys within the DOI's Solicitor's office. These attorneys met at least three times each week with professional staff at the BLM and FWS offices in Alaska. This painstaking process was done to ensure that the 2020 final EIS comported with each and every law and regulation governing DOI, including section 20001 of the 2017 Tax Act.

37.     On December 7, 2020, DOI began its first Congressionally mandated lease sale by inviting bids for Coastal Plain leases, offering twenty-two land tracts for lease with minimal economic restrictions.[35] AIDEA submitted bids for eleven tracts. DOI reviewed the bids and announced on January 6, 2021, that AIDEA was the high bidder and awarded the opportunity to enter into lease agreements on nine of the tracts. On January 13, 2021, AIDEA entered into oil and gas lease agreements with BLM for seven tracts of Coastal Plain land, covering 365,775 acres, more than one fifth of the 1.5 million acres in the Coastal Plain a/k/a the "1002 Area."

38.     The 365,755 acres leased by AIDEA covered much of western end of the

---

[34] 2020 ROD at 16–17.
[35] 85 Fed. Reg. 78865.

COMPLAINT
*Alaska Industrial Development & Export Authority v. Bureau of Land Management, et al.* Case No. 3:24:cv_____
Page **17** of **52**

Coastal Plain, and all or nearly all of the portion of the Coastal Plain along ANWR's western and northwestern boundaries, which are the areas nearest to the proven wells on adjacent State land (both onshore and offshore). This acreage contains substantial oil deposits that were both technically and economically recoverable, and thus valuable.

39.    Oil is technically recoverable if technology exists to recover it. Oil is economically recoverable if the revenues that can be earned by selling it exceed the costs of obtaining and transporting it. In Fact Sheet 0028-01, originally issued in 1998 and updated in 2001, the USGS found that the Coastal Plain was 95% certain to have at least 4.3 billion barrels of technically recoverable oil.[36] In the same document USGS found that "nearly 80 percent of the oil" would likely be "in the western part of" the ANWR Coastal Plain, "which is closest to the existing infrastructure" serving Prudhoe Bay and adjacent oil production facilities.[37] USGS based this conclusion in part on the geology of the western portion of the ANWR Coastal Plan. It specifically identified this location as the Undeformed Area to the northwest of the March Creek anticline, where the formation rocks are generally horizontal. USGS also noted the presence just to the west and northwest of the Coastal Plain of locations where recoverable oil has actually been located within

---

[36] United States Geologic Survey, *Arctic National Wildlife Refuge, 1002 Area, Petroleum Assessment, 1998, Including Economic Analysis* ("Fact Sheet"), p. 4, available at https://pubs.usgs.gov/fs/fs-0028-01/fs-0028-01.pdf.

[37] *Id.*

Case 3:24-cv-00282     Document 1     Filed 12/20/24     Page 18 of 52

State onshore and offshore leases.[38] USGS further found that oil in the ANWR Coastal Plain was economically and technically recoverable, to a 95% degree of certainty, so long as the market price for oil exceeded just $19 per barrel.[39] Indeed USGS estimated that at a price of $30 per barrel between 3 and 10.4 billion barrels of oil would be economically recoverable from the Coastal Plain.

D.   **BLM's Post-2020 Election Lease Cancellation and Subsequent Litigation**

40.   On January 20, 2021, on the first day of his term, President Biden issued Executive Order 13990, directing DOI to "place a temporary moratorium on all activities of the Federal Government relating to the implementation" of the Coastal Plain Program. On June 1, 2021, Secretary of the Interior Haaland, issued Order No. 3401 ("SO 3401") in furtherance of the presidential directive articulated in EO 13990. In SO 3401, Haaland directed her DOI to "conduct a new, comprehensive analysis of the potential environmental impacts of the Program and address the identified legal deficiencies." While that analysis was pending, Haaland directed "a temporary halt on all Department activities related to the Program in the Arctic Refuge." DOI implemented that halt by, among other things, refusing to process applications by AIDEA and its contractors, for permission to conduct preliminary archeological and seismic surveys. These actions effectively

---

[38] *Id.* at 1-6 and Figure 2.

[39] *Id*. at 1-6 and Figure 6.

Case 3:24-cv-00282   Document 1   Filed 12/20/24   Page 19 of 52

suspended AIDEA's ANWR leases indefinitely.

41. Also on June 1, 2021, Laura Daniel-Davis, DOI's Principal Deputy Assistant Secretary, sent AIDEA a letter entitled "Decision" which cited SO 3401 and explained that "it is necessary to suspend [AIDEA's] leases and complete further environmental analysis under NEPA." Daniel-Davis explained that "the BLM will undertake this additional NEPA analysis to determine whether the leases should be reaffirmed, voided, or subject to additional mitigation measures," and that when this additional NEPA analysis is "complete, the BLM will issue a new decision concerning this suspension of operations and production (SOP) of the Leases."

42. After over two years of limbo created by the suspension, BLM unilaterally cancelled AIDEA's leases. On September 6, 2023, BLM issued its Lease Cancellation Decision stating that BLM "has determined that the leases were improperly issued due to pre-leasing legal defects... and... the Department has determined that cancellation is appropriate." The decision asserted that BLM had failed in its 2019 EIS and its 2020 ROD to "analyze any alternative... that involved fewer than 2,000 acres of surface development" and had "failed to provide a quantitative estimate of downstream GHG [Greenhouse Gas] emissions resulting from reduced foreign consumption or adequately explain why it could not." Further, in a wholly conclusory fashion, the decision stated that the ANILCA § 810 analysis of subsistence hunting impact was deficient. Based on these purported errors BLM terminated AIDEA's leases.

COMPLAINT
*Alaska Industrial Development & Export Authority v. Bureau of Land Management*, *et al.* Case No. 3:24:cv_____
Page **20** of **52**

Case 3:24-cv-00282    Document 1    Filed 12/20/24    Page 20 of 52

43.     During a call with reporters on September 6, 2023, Secretary Haaland explained that she had authorized the lease termination, and that "with today's action no one will have rights to drill oil in one of the most sensitive landscapes on Earth."[40]

44.     BLM's lease suspension decision is currently the subject of related litigation on appeal to the Ninth Circuit Court of Appeals styled *Alaska Industrial Development and Export Authority v. Biden,* Case No. 3:21-cv-00245-SLG (USDC Alaska) and 24-2533 (Ninth Circuit) (briefing in process). BLM's lease termination decision is currently the subject of related litigation in this Court styled *Alaska Industrial Development and Export Authority v. U.S. Dep't of the Interior,* Case No. 3:24-cv-00051-SLG, in which the parties have completed summary judgment briefing and are awaiting decision on the legality of BLM's lease cancellation.

E.     **BLM's Supplemental EIS for the Congressionally Mandated Second ANWR Lease Sale**

45.     The 2023 cancellation decision was issued in conjunction with a Draft Supplemental Environmental Impact Statement ("Draft SEIS") that set forth DOI's new analysis on how to minimize impacts on subsistence hunting and fishing, and what to do

---

[40] National Public Radio, *Biden ends drilling in ANWR, sparking criticism, as Willow Project moves forward*, (Sept. 7, 2023), https://www.npr.org/2023/09/06/1197945859/anwr-alaska-drilling-oil-gas-leases-environment-energy-climate-change (last accessed Dec. 19, 2024).

regarding greenhouse gas emissions.[41] DOI sought public comment on these three issues and other matters for purposes of developing a final SEIS and new ROD, and this Draft SEIS formed the basis for the final 2024 SEIS underlying the 2024 Coastal Plain Oil and Gas Leasing Program ROD.

46.     The 2024 SEIS issued on November 5, 2024, differs little from the Draft SEIS.

47.     Alternative B is materially the same as the alternative previously selected by the BLM in 2019 when it held a lease sale governing much of the lands currently in dispute. Alternative B fully complies with the spirit and the text of the 2017 Tax Act by: (a) offering to lease the entire program area while implementing sufficient restrictions to protect against unnecessary environmental harms, (b) permitting up to 2,000 acres of surface disturbance, and (c) permitting seismic exploration across the program area.[42] Despite being previously selected by BLM as the preferred action alternative in 2019, Alternative B was not selected as the preferred action alternative in the 2024 SEIS.[43]

48.     Under Alternative C much of the area available for lease sale would be subject to no surface occupancy limitations.[44] Alternative C would permit seismic

---

[41] 88 Fed. Reg. 62104. This publication started a 45-day comment period that BLM refused to extend despite multiple requests from stakeholders.

[42] 2024 SEIS at ES-4.

[43] *Id.* at ES-5.

[44] *Id.*

exploration only in areas available for lease sale and would allow only 1,464 acres of surface disturbance.[45] Alternative C was not selected as the preferred alternative in the 2024 SEIS.[46]

49.     Alternative D is far more restrictive than any of the alternatives considered by BLM in the 2019 EIS. Indeed, BLM acknowledges that Alternative D emphasizes conservation by implementing additional lease stipulations and requiring operating procedures that were not considered in the 2019 EIS.[47] Alternative D, like Alternative C, would permit seismic exploration only in areas available for lease sale.[48] Alternative D would permit approximately 1,040 acres of surface disturbance.[49] Alternative D was not selected as the preferred action alternative in the 2024 SEIS.[50]

50.     Alternative D2 is a variation on Alternative D, which makes precisely 400,221 acres available for the lease sale.[51] Under Alternative D2 seismic exploration would only be permitted in areas available for lease sale and only 995 acres of surface

---

[45] *Id.*

[46] *Id*.

[47] *Id*.

[48] *Id.* at ES-5.

[49] *Id*.

[50] *Id.*

[51] *Id.*

COMPLAINT
*Alaska Industrial Development & Export Authority v. Bureau of Land Management*, *et al.* Case No. 3:24:cv_____
Page **23** of **52**

disturbance would be allowed.[52] BLM chose D2 as its Preferred Alternative.[53]

51.     In selecting Alternative D2, BLM failed to demonstrate why the additional lease stipulations and Required Operating Procedures ("ROP") are reasonable. In fact, the 2024 SEIS does not even include a robust, clear description of the data the BLM and USFWS used to develop the ROP and No Surface Occupancy stipulations which are the fundamental difference between alternatives.

F.     **The Preferred Alternative selected in BLM's 2024 SEIS Demonstrates an Intent to Subvert the 2017 Tax Act**

52.     Alternative D2 makes 400,221 acres available for the lease sale,[54] in alleged compliance with the minimum acreage requirement of the 2017 Tax Act.[55] However, the acreage available under Alternative D2 is largely recycled acreage from BLM's previous lease sale which includes AIDEA's leases that BLM illegally cancelled and that remain the subject of pending litigation.[56] In fact, 282,530 acres or *over 70 percent* of the acreage that BLM makes available for its purported second lease sale *has already been leased to AIDEA*.[57] Further, another tract set for leasing is the subject of current litigation between

---

[52] *Id*. at 3-134.

[53] *Id*. at ES-5.

[54] Coastal Plain Detailed Statement of Sale ("2024 DSS") at Ex. B (Dec. 9, 2024).

[55] *See* generally 2024 ROD.

[56] 2024 ROD at ES-5.

[57] Attached as Exhibit A1 is AR 3316 from case 3:24-cv-00051-SLG, a DOI map showing in blue the seven tracts previously leased to AIDEA, totaling 365,775 acres and in brown the acres previously leased to the two other lessees who voluntarily surrendered their leases. AIDEA was the high bidder on Tracts 22 and 23 but did not lease those. Exhibit A2

COMPLAINT

*Alaska Industrial Development & Export Authority v. Bureau of Land Management*, *et al*. Case No. 3:24:cv_____
Page 24 of 52

Case 3:24-cv-00282     Document 1     Filed 12/20/24     Page 24 of 52

the State of Alaska and BLM where the very title to the acreage is in dispute.[58] Consequently, of the allegedly compliant near-minimum 400,221 acres offered, only 97,919 acres, or less than 25%, is not in the midst of lease or title litigation.

53.     Because 302,302 acres of the 400,221 acres Alternative D2 contemplates for leasing *are already currently leased or are the subject of an ongoing title dispute*, BLM's second lease sale does not comport with the 2017 Tax Act's directive to have a lease sale of no less than 400,000 acres.[59] Simply put, neither the acreage that AIDEA already leased in the first lease sale, nor the acreage subject to the title dispute, should count towards the mandatory minimum acreage required by the 2017 Tax Act for the second lease sale.[60] Indeed, regardless of whether BLM's cancellation of AIDEA's leases was unlawful or lawful, BLM could not count the acres it leased AIDEA towards its obligation to offer 400,000 acres for lease in the second lease sale, because BLM had already counted those

is Map 2.7 of the 2024 SEIS that shows in purple the areas BLM is withdrawing from leasing and shows in other colors areas that BLM is offering in the January 2025 lease sale. Calculating the acreage previously leased to AIDEA that DOI now proposes to re-auction requires subtracting the tract acreages offered in the 2024 DSS (Ex. B) for AIDEA's leased tracts (16, 17, 24, 26, 27, 30, and 31) from the acreage offered for those tracts in the 2020 Amendment to the Detailed Statement of Sale ("2020 DSS") at (Ex. B) (Dec. 18, 2020). The difference in each individual tract's acreage between the 2024 DSS and 2020 DSS quantifies the acreage for each of those tracts that BLM has identified as "not available for lease sale" in its January 2025 lease sale.

[58] *State of Alaska v. U.S. Dep't of Interior, et al.*, 3:22-cv-00078-SLG. That case is in the midst of summary judgment briefing scheduled to be completed by Jan. 27,2025 per the Scheduling Order at Docket No. 32.

[59] 2017 Tax Act § 20001(c).

[60] *Id.*

Case 3:24-cv-00282     Document 1     Filed 12/20/24     Page 25 of 52

same acres towards its separate obligation to offer 400,000 acres in the first lease sale.

54.     The remainder of the acreage that BLM offers to ostensibly meet the Congressionally mandated 400,000 acre minimum second sale is subject to numerous onerous restrictions rendering the acreage essentially worthless for the required oil and gas program. That acreage is located within five tracts offered in the purported second lease sale: Tracts 22, 23, 25, 29 and 32. All five tracts are entirely or largely subject to BLM's draconian restrictions dictating no surface occupancy or highly constrained surface use. The restrictions also extend to the other tracts that were previously leased to AIDEA.

55.     These onerous restrictions are a direct effort to subvert the 2017 Tax Act. The 2017 Tax Act requires BLM "establish and administer a competitive oil and gas program" with the goal of ultimately generating income for the Federal Government. To accomplish this, Congress directed BLM to offer for lease "those areas that have the highest potential for the discovery of hydrocarbons."

56.     Experts, including USGS and BLM, agree that the areas located in the northwest corner of the coastal plain have the highest potential for the discovery of hydrocarbons.

COMPLAINT
*Alaska Industrial Development & Export Authority v. Bureau of Land Management*, *et al.* Case No. 3:24:cv_____
Page **26** of **52**

Case 3:24-cv-00282     Document 1     Filed 12/20/24     Page 26 of 52



57.     Yet BLM made wide swaths of this area with the highest likelihood of hydrocarbons inaccessible by fastidiously imposing restrictive use conditions designed to appear technically appropriate while rendering this acreage uneconomic to develop. Worse yet BLM imposed these conditions without the benefit of seismic exploration, detailed development applications, or the other typical steps that would happen before production and that would allow BLM to conduct appropriate reasoned decision-making in conditioning oil and gas production on the Coastal Plain. Indeed, that is how oil and gas production is regulated in the NPRA and how Congress directed BLM to develop its Coastal Plain oil and gas program.[61]

---

[61] 2017 Tax Act § 20001(b)(3).

58.     The result of these restrictions is a dramatic disparity between what Congress directed the BLM to do and what the BLM is actually doing. For example, the 2024 SEIS estimates that under Alternative B (which is essentially the same as the alternative that BLM previously selected in the 2019 FEIS), "approximately 1.9 [billion barrels of oil] could ultimately be produced from the program area."[62] In contrast because of the excessive restrictions that BLM has blindly imposed, BLM's own estimate indicates that under Alternative D2 only "0.4 [billion barrels of oil] could ultimately be produced from the program area."[63] Nearly five times the amount of estimated oil production would occur under BLM's previous preferred alternative compared to BLM's current preferred alternative. Despite Congress's clear direction to establish a *competitive* leasing program BLM seeks to establish a program that is doomed from the outset. BLM acknowledges the impacts these restrictions will likely have on the oil and gas program, stating "these limitations could . . . reduce oil production, or *even prevent development . . .*"[64]

59.     BLM may argue that despite the burdensome surface use conditions contemplated in Alternative D2 a prospective lessee could still access hydrocarbon deposits by use of horizontal drilling to develop the mineral resources Congress has made available. Any such argument is in defiance of both geology and physics.

---

[62] 2024 SEIS at ES 3-49.

[63] *Id.* at *ES* 3-51.

[64] *Id.*

60.     BLM states in the 2024 SEIS that horizontal or extended reach drilling "can extend up to 6 or more miles from the drilling location."[65] This statement is misleading as it describes the *bore length* rather than *the geographic distance*. Although the total distance from the surface drilling point may extend 6 miles, much of this distance is vertical rather than horizontal. In terms of geographic distance, or "as the crow flies" distance from the drilling location, between 2 and 2.5 surface miles is likely the maximum horizontal distance achievable to target the best formations in Area 1002.

61.     Under Alternative D2, large continuous areas are available for lease, but no surface occupancy is permitted. Because these areas of no surface occupancy are so expansive, much of the area for lease falls well beyond 2.5 miles from a location where a drill pad could potentially be placed. With large portions of the area with the highest potential for discovery of hydrocarbons rendered inaccessible because of BLM's no surface occupancy limitations and other onerous restrictions, BLM's adoption of Alternative D2 effectively bars development in the very area that Congress directed should be leased in the 2017 Tax Act.[66]

62.     Acreage that is completely inaccessible because it is isolated by miles of lands subject to no surface occupancy should not count towards BLM's mandatory minimum acreage for the second lease sale. Leased lands subject to restrictions which

---

[65] *Id.* at ES-5.

[66] 2017 Tax Act § 20001(c)(1)(B).

make it impossible to reach the oil and gas underlying those lands may as well have never been leased in the first place because no production or development can occur. This is precisely the opposite of what the 2017 Tax Act requires.[67]

63.     Additionally, Alternative D2 further hamstrings a potential oil and gas program by removing from potential lease thousands of acres from the area with the highest likelihood of hydrocarbons.[68] Alternative D2 in Map 2 carves out various areas of land within the area of highest hydrocarbon potential from leasing, precluding even subsurface development through directional drilling. The purported rationales offered by BLM, such as polar bear protection, relate to matters occurring on the surface, and ignore the protections that will and must be applied by BLM later in the development process, when applications for permits are submitted by lease holders before actual development activity.

64.     By choosing Alternative D2, BLM attempted to avoid true compliance with the 2017 Tax Act. Instead of facilitating a competitive oil and gas program, BLM selected an alternative that is so restrictive only a tiny fraction of the estimated oil available could potentially be extracted. Instead of proposing a lease area with at least 400,000 acres of land that is actually leasable with conditions that allow for economic development,

---

[67] 2017 Tax Act § 20001.

[68] *Compare* 2024 DSS Ex. B *with* 2020 DSS Ex. B (showing significantly decreased acreages offered for lease across all tracts offered in both lease sales).

Alternative D2 recycles acreage BLM has already leased to AIDEA, offers to lease acreage that the State claims to own, and completely restricts any potential development of thousands of acres.

G.   **The Legally Flawed, Procedurally Defective, and Arbitrary and Capricious 2024 ROD**

65.   On December 9, 2024, BLM issued the 2024 ANWR Lease Sale ROD adopting Alternative D2.[69] Because Alternative D2 of the 2024 SEIS is at odds with the purpose and text of the 2017 Tax Act, it should never have been selected as the preferred alternative. By selecting D2 in the 2024 ROD, the BLM cemented itself to this faulty position. The 2024 ROD should be vacated because: (1) it implements restrictions that are contrary to the purpose of the 2017 Tax Act, (2) it fails to provide the minimum acreage required by the 2017 Tax Act, and (3) it is based on a procedurally incomplete NEPA analysis.

66.   *First*, the 2017 Tax Act requires BLM offer "those areas that have the highest potential for the discovery of hydrocarbons," for lease, and explicitly amends the purpose of ANILCA to include oil and gas development.[70] Because of the excessive restrictions, especially no surface occupancy restrictions, thousands of acres purported to be offered for lease are completely inaccessible even with long lateral horizontal drilling methods. That

---

[69] 2024 ANWR Lease Sale Supplemental EIS Record of Decision (Dec. 9, 2024) ("2024 ANWR Lease Sale ROD") at 2.

[70] 2017 Tax Act § 20001(b)–(c).

acreage is essentially unleasable. The effect of these arbitrary and unreasonable restrictions is that instead of offering an opportunity to develop an estimated 1.9 billion barrels of oil, which is possible under Alternative B, the 2024 ROD and 2024 DSS offer only an estimated 0.4 billion barrels.[71]

67.     *Second*, the 2017 Tax Act requires a mandatory minimum of 400,000 acres be available for *each* of the two statutorily mandated lease sales.[72] The first lease sale resulted in AIDEA successfully leasing 365,775 acres. After illegally cancelling those leases, BLM now seeks to re-lease 282,530 of those acres while barring leasing on the remainder. In other words, over 70 percent of the acreage that the 2024 ROD makes available for lease is already leased by AIDEA. BLM should not be permitted to double dip these acres counting them towards the mandatory minimum of the first and the second lease sales. Moreover, regardless of whether the lease cancellation was valid, BLM cannot properly count the acres it leased AIDEA towards both its obligation to offer 400,000 acres in the first lease sale and also towards its separate and additional obligation to offer 400,000 acres in the second lease sale.    BLM cannot offer the same acreage twice and claim compliance with the mandate to conduct two lease sales.

68.     Similarly, BLM subverts the judicial process by relying on acreage where

---

[71] *Compare* 2024 FEIS at ES 3-49 with ES 3-51.

[72] 2017 Tax Act § 20001(c)(1)(B).

the State of Alaska asserts the right to ownership.[73] Title of Tract 29 is clouded and currently the subject of litigation between the State of Alaska and BLM.[74] Despite this, and despite having hundreds of thousands of acres from which BLM could supplement and build a cushion in case the court determines that Tract 29 should be conveyed to the State of Alaska, BLM instead relies on 19,772 acres within Tract 29 to meet the mandated minimum of 400,000 acres. This is demonstrative of the game BLM is playing. Unapologetically, the BLM is doing just enough to appear legal without ever actually complying with the 2017 Tax Act's mandate to establish a competitive oil and gas program on the Coastal Plain, including holding two separate and distinct lease sales with a separate and distinct 400,000 acres offered in each sale.

69. *Third,* BLM circumvented the public comment process by creating and then selecting Alternative D2 *after* the public comment period ended. In addition, when several parties including AIDEA and Kaktovik addressed flaws in Alternative D2 in post-comment-period submissions filed in the short interval between BLM's release of the Final SEIS announcing new Alternative D2 and BLM's issuance of the 2024 ROD, BLM did not meaningfully respond to those submissions.[75]

---

[73] *State of Alaska v. U.S. Dep't of Interior, et al.*, 3:22-cv-00078-SLG. That case is in the midst of summary judgment briefing scheduled to be completed by Jan. 27, 2025 per the Scheduling Order at Docket No. 32.

[74] *Id.*

[75] 2024 ROD at 16.

**H.     The 2024 ANWR ROD Improperly Seeks to Amend the 2017 Tax Act by Reducing the Statute's 2,000 Acre Limitation on Surace Facilities**

70.     The 2017 Tax Act provides "the Secretary shall authorize up to 2,000 surface acres of Federal Land on the Coastal Plain to be covered by production and support facilities (including airstrips and any area covered by gravel berms or piers for support of pipelines) during the term of the leases under the oil and gas program under this section."[76] The 2019 FEIS and 2020 ROD appropriately analyzed and applied this acreage limitation. The clause allows the leaseholder(s) to construct production and support facilities covering "up to" 2,000 acres, leaving the leaseholders discretion to utilize less acreage with such facilities still subject to additional BLM permitting processes and requirements. Thus, the statutory discretion to disturb less than 2,000 surface acres in the phrase "up to" lies with the Lessee(s), not BLM. Through the 2024 SEIS and 2024 ANWR Lease Sale ROD, BLM has taken it upon itself to unilaterally reduce this acreage limitation in violation of the statute by refusing to even analyze or allow for up to 2,000 acres to be used to support surface facilities. Indeed, the 2024 ROD permits only 995 acres of surface disturbance, out of the 1.5 million acres in the ANWR Coastal Plain.[77] The 2024 ROD misreads the 2,000-acre limitation as allowing BLM discretion to arbitrarily cap surface development at some random figure well below 2,000 acres without regard to the information that would be

---

[76] 2017 Tax Act § 20001(c)(3).

[77] "Under Alternative D2," which is DOI's Preferred Alternative, there would be "a total allowable development footprint of 995 acres …." 2024 SEIS at 3-51.

COMPLAINT

*Alaska Industrial Development & Export Authority v. Bureau of Land Management*, *et al*. Case No. 3:24:cv_____
Page **34** of 52

Case 3:24-cv-00282     Document 1     Filed 12/20/24     Page 34 of 52

gathered from further exploration by leaseholders and offered in the production and support facility permitting processes. And BLM does so while specifically admitting that its preferred alternative and arbitrary surface-occupancy cap reduces economically recoverable oil by roughly 80% and to the point where BLM's unreasoned limitations may stop Coastal Plain oil and gas development entirely.

I.     **BLM Cannot Use the Alleged Conservation Concerns in the 2024 SEIS to Defy Congress's Express Development Mandate in the 2017 Tax Act.**

71.     Congress has spoken on how it wants the Coastal Plain managed. Previously section 303(2)(B) of ANILCA stated that the purposes of the Arctic National Wildlife Refuge were wildlife conservation, complying with international treaties, and providing opportunities for continued subsistence use.[78] The 2017 Tax Act added an additional purpose: "provide for an oil and gas program on the Coastal Plain."[79] By its express terms ANILCA, as modified by the 2017 Tax Act, directs that management of the Arctic National Wildlife Refuge as a whole should be done in a manner that will facilitate oil and gas development on the Coastal Plain.[80] As part of that program BLM must offer to lease "those areas that have the highest potential for discovery of hydrocarbons."[81] These words are clear and there is no discretion to withhold acreage that has the highest potential for

---

[78] 94 Stat. 2390.

[79] 2017 Tax Act § 20001(b)(2)(B).

[80] 2017 Tax Act §20001(b)(2)(B) and 94 Stat. 2390.

[81] 2017 Tax Act §20001(c)(1)(B).

discovery of hydrocarbons. BLM and its putative lessees can work together to create plans that minimize the environmental impact of development, but BLM cannot continue to withhold the lands at issue in this case, or so restrict development as to make those lands *de facto* inaccessible.

### J.   BLM's Actions Undermine the Overarching Financial Purpose of the 2017 Tax Act.

72.     As the name suggests, the 2017 Tax Act was a fiscal measure. Specifically, the 2017 Tax Act passed through Congress as a reconciliation bill. Reconciliation bills that reduce revenue must have a way of offsetting that reduction.[82] The 2017 Tax Act reduced revenue because it reduced the tax burden of various businesses, individuals and their estates.[83] One of the ways that Congress intended to offset the reduced revenue was by royalties it expected to collect from oil and gas leasing on the Coastal Plain.[84]

73.     The 2024 ROD undermines what Congress directed BLM to do - establish a competitive oil and gas program. The ROD also contributes to the federal deficit. Without the revenue that Congress anticipated garnering from oil and gas royalties, the tax relief afforded under the 2017 Tax Act will not be offset as Congress expressly intended.

---

[82] Cong. Research Serv., *Budget Reconciliation Legislation: Development and Consideration* (Nov. 30, 2015), *https://crsreports.congress.gov/product/pdf/RS/98-814*, at 2.

[83] *See generally* 2017 Tax Act §20001.

[84] Cong. Research Serv., *Arctic National Wildlife Refuge (ANWR) Provisions in P.L.115-97, Tax Cuts and Jobs Act* (Feb. 21, 2018)

https://crsreports.congress.gov/product/pdf/IF/IF10782/9.

**K.** **The 2024 ANWR Lease Sale ROD Violates NEPA and is Arbitrary and Capricious Because it is Based on Flawed Analysis in the 2024 SEIS and Because it is an Arbitrary and Capricious Departure from how BLM Conducted the 2020 ANWR Lease Sale**

74.     NEPA requires federal agencies to prepare a detailed EIS for every major federal action that will have a significant impact on the quality of the human environment.[85] In doing so, agencies must take a "hard look" at the direct, indirect, and cumulative environmental impacts of any proposed action, as well as the means to mitigate against those adverse environmental consequences.[86] NEPA requires that an EIS include a detailed analysis of the direct, indirect, and cumulative impacts of the proposed action together with the impacts of past, present, and reasonably foreseeable activities.[87] NEPA regulations define cumulative effects as "the effects on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions."[88] "The regulatory definition incudes impacts resulting from 'individually minor but collectively significant actions taking place over a period of time.'"[89] Thus, "[e]ven if a single, comprehensive EIS is not required, the agency must still

---

[85] 42 U.S.C. § 4332.

[86] 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.14, 1502.16, 1508.1.

[87] 40 C.F.R. § 1508.1.

[88] *Id.*

[89] *Churchill Cty. V. Norton*, 276 F.3d 1060, 1076 (9th Cir. 2001) (quoting 40 C.F.R. § 1508.7).

COMPLAINT
*Alaska Industrial Development & Export Authority v. Bureau of Land Management, et al.* Case No. 3:24:cv_____
Page 37 of 52

adequately analyze the cumulative effects of the projects within each [NEPA document]."[90]

75.    NEPA is implemented through regulations promulgated by the Council on Environmental Quality ("CEQ") as well as agency-specific regulations and policies. The Fiscal Responsibility Act ("FRA")[91] made significant and pertinent amendments to NEPA, including thresholds and the definition of "major federal action." The CEQ regulations in place in 2021 when BLM issued its Notice of Intent for the Draft SEIS also include this definition. The effective date of the FRA NEPA amendments was June 3, 2023, when the statute was signed into law, as acknowledged by the CEQ's publication in the Federal Register on July 31, 2023.[92]

76.    Here, in addition to violating the 2017 Tax Act, the 2024 SEIS and 2024 ROD contain numerous other fundamental flaws, and in doing so, fail to satisfy NEPA's legal requirements and regulatory mandates.

77.    *First*, the ANWR Leasing Program is not a "major federal action" subject to NEPA. Under the 2020 CEQ Regulations, a "major federal action" requiring environmental review does not include, "[a]ctivities or decisions that are non-discretionary and made in accordance with the agency's statutory authority."[93] The FRA reconfirmed this point by providing that the definition of a major federal action does not include "activities or

---

[90] *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1306 (9th Cir. 2003).

[91] *See generally* Pub. L. 118-5.

[92] 88 Fed. Reg. 49924.

[93] 40 CFR 1508.1(w)(2)(vii).

decisions that are non- discretionary and made in accordance with the agency's statutory authority."[94] Further, the FRA states that an agency is not required to prepare an environmental document when the result of the threshold determination is that "the proposed agency action is a nondiscretionary action with respect to which such agency does not have authority to take environmental factors into consideration in determining whether to take the proposed action."[95] The regulations that implement NEPA, which were revised in 2020 and 2022, state that in assessing whether NEPA applies, "Federal agencies should determine … whether compliance with NEPA would clearly and fundamentally conflict with the requirements of another provision of Federal Law."[96] Here, the 2017 Tax Act mandates an oil and gas exploration program in Area 1002 and BLM cannot try and evade this requirement by manipulating NEPA requirements and regulations and issuing endless EIS documents trying to stymie oil and gas development. BLM is without discretion in creating a leasing program and holding two lease sales, with certain parameters prescribed by Congress. The Secretary's decision to *sua sponte* direct further environmental review violated regulation current in 2021 and now violates the basic parameters of NEPA as amended by the FRA.

78.     *Second*, even if there is a "major federal action" at issue, there was never a

---

[94] 42 U.S.C. § 4336e(10)(B)(vii).

[95] 42 U.S.C. § 4336(a)(4).

[96] 40 CFR 1501.3.

Case 3:24-cv-00282     Document 1     Filed 12/20/24     Page 39 of 52

need for a supplemental EIS after completion of the 2019 EIS and issuance of the 2020 ROD. NEPA regulations are clear that supplementation is only necessary where there are changes to the proposed action (which is not applicable here) or "new information for circumstances relevant to environmental concerns and bearing on the proposed action or its impacts would result in significant environmental impacts evaluated in the EIS."[97] Here, there is no such "new information or circumstances" justifying the 2024 SEIS beyond the results of the 2020 election.

79.     *Third*, the 2024 SEIS analyzes alleged impacts of the ANWR Leasing program that are not ripe. CEQ regulations state, "Agencies generally should tier their environmental impact statements and environmental assessments when it would eliminate repetitive discussions of the same issues, focus on the actual issues ripe for decision, and exclude from consideration issues already decided."[98] Here, the 2024 EIS analyzes impacts associated with future development of oil and gas leasing, rather than on the issuance of the leases themselves. Leasing simply does not equate to development and the leases specifically provide for another layer of environmental review before physical disturbances on the leaseholds can occur. Indeed, the 2020 ROD expressly stated that "if and when BLM is presented with proposals for exploration or development, those decisions by BLM for specific authorizations will also be subject to project specific analysis, including

---

[97] 23 C.F.R. § 771.130(a)(2).

[98] 40 CFR § 1501.11(b).

Case 3:24-cv-00282     Document 1     Filed 12/20/24     Page 40 of 52

compliance with NEPA and other laws."[99] Similarly, the 2024 ROD states that it "does not authorize any specific on-the ground activity associated with the exploration for or development of oil and gas resources on the Coastal Plain," explaining that subsequent NEPA analysis would be required based on project specific proposals.[100]

80. *Finally*, and in the alternative, the entire 2024 SEIS is flawed because it relies on CEQ regulations, and under a recent DC Circuit decision, CEQ lacks the authority to issue binding regulations implementing NEPA.[101]

**L.** **The 2024 ANWR Lease Sale ROD's Consideration of Subsistence Impacts Under Section 810 of ANILCA is Fundamentally Flawed**

81. Title VIII, Section 810 of ANILCA, requires federal agencies with jurisdiction over lands in Alaska to evaluate the potential impacts of proposed actions on subsistence uses and needs.[102] A Section 810 Evaluation is required for any action to

---

[99] 2020 ROD at 2.

[100] 2024 ROD at 5.

[101] *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902 (D.C. Cir. 2024).

[102] Section 810 is codified at 16 U.S.C. § 3120(a), which states:

> In determining whether to withdraw, reserve, lease, or otherwise permit the use, occupancy, or disposition of public lands ... the head of the Federal agency ... over such lands ... shall evaluate the effect of such use, occupancy, or disposition on subsistence uses and needs, the availability of other lands for the purposes sought to be achieved, and other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes. No such withdrawal, reservation, lease, permit, or other use, occupancy or disposition of such lands which would significantly restrict subsistence uses shall be effected until the head of such Federal agency –

withdraw, reserve, lease, or otherwise permit the use, occupancy, or disposition of public lands in Alaska.

82.    Procedurally, Section 810 requires up to four steps of agency analysis and action:

- A three-part evaluation analyzing: (1) the effect of the proposed action on subsistence uses and needs; (2) the availability of other lands for the purposes sought to be achieved; and (3) other alternatives that would reduce or eliminate the proposed action from lands needed for subsistence purposes;
- A finding of whether a proposed action may have significant restriction on subsistence uses;
- If there is a significant impact on subsistence uses, a notice and hearing; and
- A three-part determination by the agency before the proposed action is authorized.

83.    Here, BLM fails to include supporting data and analysis regarding the specific subsistence impacts it alleged in the 2024 SEIS, such as the impact that an access

---

(1) gives notice to the appropriate State agency and the appropriate local committees and regional councils established pursuant to section 805;

(2) gives notice of, and holds, a hearing in the vicinity of the area involved; and

(3) determines that (A) such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands, (B) the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other disposition, and (C) reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such actions.

road *may* have on a caribou herd. Caribou herds and other species, however, can safely co-exist and even increase in numbers while responsible oil production occurs on the North Slope of Alaska, as demonstrated by over 50 years of experience in and around Prudhoe Bay.

84.     The 2024 SEIS also fails to point out that infrastructure in the NPR-A and Prudhoe Bay such as roads facilitate subsistence activities including berry picking, fishing, and hunting. That infrastructure has provided easier and cheaper access, while increasing transportation safety to traditional grounds.

85.     Further, the subsistence analysis in the 2024 SEIS is flawed because it picks and chooses which "indigenous" knowledge to use regarding the Porcupine Caribou Herd. The 2024 SEIS heavily considers input of the Gwich'in (who do not reside in Area 1002) and does not adequately reflect input from the Village of Kaktovik, the North Slope Borough, and the Iñupiat Community of the Arctic Slope. For example, the 2024 SEIS includes maps and analysis of the Herd's migration and calving patterns. As explained in comments filed by the Kaktovik Inupiat Corporation, the ANCSA Native Village Corporation for the village of Kaktovik ("KIC"), these maps disregard the observations of Kaktovik locals that the Herd continues to calve east of Kaktovik and that the 2024 SEIS's modeling of future calving patterns within Area 1002 is fundamentally flawed.[103] KIC also pointed out to BLM that "after 50 years of observation our people can tell you that caribou

---

[103] November 2, 2003 KIC Request for 180-day extension of the Public Comment Period.

like gravel and infrastructure. They use it for insect relief because it is off the tundra, and they use it for calf protection because where there is infrastructure it provides predator abatement. Caribou have now been living with gravel and infrastructure through many generations and it has become a natural part of their annual movements."[104]

86.     Finally, and most fundamentally, the 2024 SEIS does not properly account for the fact that ANILCA struck a careful balance between subsistence uses and resource development because *economic development and opportunities foster and further subsistence opportunities*. Modern subsistence involves the use of snowmachines, ATVs, boats, fuel, guns, and ammunition. The reality is that without cash and continued economic opportunity, modern subsistence activities are not possible. The subsistence analysis in the 2024 SEIS is entirely out of balance and goes out of its way to conclude that any development can only negatively impact subsistence and therefore must be curtailed through acreage and use restrictions.

M.     **2024 ANWR Lease Sale ROD Violates ANILCA's "No More" Clause**

87.     ANILCA also contains a "no more" clause in Section 1326 prohibiting future land withdrawals without Congressional approval, thus making clear that lands not already earmarked for conservation were available to satisfy ANILCA's goal of ensuring economic opportunity.[105] Congress also made clear in passing ANILCA that:

---

[104] *Id.*

[105] 16 U.S.C. § 3213 which provides:

Case 3:24-cv-00282     Document 1     Filed 12/20/24     Page 44 of 52

[T]he designation and disposition of the public lands in Alaska pursuant to this Act are found to represent a proper balance between the reservation of national conservation system units and those public lands necessary and appropriate for more intensive use and disposition, and thus Congress believes that the need for future legislation designating new conservation system units, new national conservation areas, or new national recreation areas, has been obviated thereby.[106]

By refusing to conduct a lease sale for the ANWR Coastal Plain in accord with the 2017 Tax Act, BLM is effectively resurrecting prior development limits that Congress lifted, and BLM is not only doing so without Congressional authorization, but in complete contravention of what Congress directed.

## N. **BLM Must Be Compelled to Conduct a Lease Sale in Accord with the 2017 Tax Act**

88. As set forth in detail above, Congress mandated a leasing program for the

---

(a) No future executive branch action which withdraws more than five thousand acres, in the aggregate, of public lands within the State of Alaska shall be effective except by compliance with this subsection. To the extent authorized by existing law, the President or the Secretary may withdraw public lands in the State of Alaska exceeding five thousand acres in the aggregate, which withdrawal shall not become effective until notice is provided in the Federal Register and to both Houses of Congress. Such withdrawal shall terminate unless Congress passes a joint resolution of approval within one year after the notice of such withdrawal has been submitted to Congress.

(b) No further studies of Federal lands in the State of Alaska for the single purpose of considering the establishment of a conservation system unit, national recreation area, national conservation area, or for related or similar purposes shall be conducted unless authorized by this Act or further Act of Congress.

[106] 16 U.S.C. § 3101(d).

ANWR Coastal Plain and BLM has no authority to resists this Congressional enactment by refusing to conduct a lease sale in good faith and instead manufacture restrictions and essentially foreclosing any further economic activity in ANWR. BLM's only discretionary authority is narrowly focused on what precise reasonable conditions it may apply to a lease sale, as demonstrated by BLM's initial ANWR lease sale in 2020.

89.    Because BLM is now refusing to conduct a lease sale that complies with the 2017 Tax Act, the Court must compel BLM to act. While the Court could grant this relief under the federal mandamus statute (28 U.S.C. § 1361), in the Ninth Circuit "mandamus relief and relief under the APA are 'in essence' the same," and when a complaint seeks relief under the Mandamus Act and the APA and there is an adequate remedy under the APA, the court may elect to analyze the APA claim only.[107]

90.    Under the APA, a court may "compel agency action . . . unreasonably delayed."[108] In the Ninth Circuit, a court may compel agency action under the APA when the agency (1) has "a clear, certain, and mandatory duty," and (2) has unreasonably delayed in performing such duty.[109] The Ninth Circuit addresses unreasonable delay using the "*TRAC* factors" – the six-factor balancing test applied by the D.C. Circuit in

---

[107] *R.T. Vanderbilt Co. v. Babbitt*, 113 F.3d 1061, 1065 (9th Cir. 1997) (quoting *Indep. Mining Co. v. Babbitt*, 105 F.3d 502, 507 (9th Cir. 1997)).

[108] 5 U.S.C. § 706(1).

[109] *Plaskett v. Wormuth,* 18 F.4th 1072, 1082 (9th Cir. 2021).

*Telecommunications Research & Action Center v. FCC.*[110]

91.     The TRAC factors are: (1) the time agencies take to make decisions must be governed by a "rule of reason[";] (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"[111]

92.     The first TRAC factor, rule of reason, and second TRAC factor, Congressional timeline, can be considered together and weigh in favor of granting relief.[112] Congress spoke plainly, two lease sales for "those areas that have the highest potential for the discovery of hydrocarbons," with the first sale to be completed by December 22, 2021, and the second by December 22, 2024.[113] BLM initially complied and held a lease sale that

---

[110] *Indep. Mining*, 105 F.3d at 507.

[111] *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 79–80 (D.C. Cir. 1984).

[112] *Indep. Mining*, 105 F.3d at 507.

[113] 2017 Tax Act *at* § 20001(c)(1).

COMPLAINT
*Alaska Industrial Development & Export Authority v. Bureau of Land Management*, *et al*. Case No. 3:24:cv_____
Page **47** of **52**

Case 3:24-cv-00282     Document 1     Filed 12/20/24     Page 47 of 52

resulted in AIDEA leasing 365,775 acres. That compliance was short lived, as BLM under the Biden administration has since interfered with the results of the first lease sale and now offers a lease sale that does not comply with the text and intent of the 2017 Tax Act.

93.     The third TRAC factor, concerning human health, and the fifth TRAC factor, the interests prejudiced by delay, can also be considered together and similarly weigh in favor of granting relief.[114] As has been discussed above, the leases do not actually permit any ground disturbance, therefore, there are no potential environmental impacts that could cause adverse health impacts to individuals living in and around the Coastal Plain. Conversely, additional delays and uncertainties regarding leasing availability and the burdensome restrictions of those leases, cause financial prejudice to the local economy of the North Slope AIDEA and other interested parties.

94.     The fourth factor asks the Court to consider the effect of expediting delayed action on agency activities of a higher or competing priority, and Courts generally do not compel agency action where the result would be to merely expedite the consideration of a plaintiff's application ahead of others.[115] This is not one of those instances. AIDEA is not attempting to jump the line in front of other prospective lessees. Instead, AIDEA is seeking for BLM to follow the directives of the 2017 Tax Act which will benefit everyone,

---

[114] *Indep. Mining*, 105 F.3d at 509.

[115] *See, e.g.*, *Kiani v. U.S. Citizenship & Immigr. Servs.*, 2024 U.S. Dist. LEXIS 220724, *18 (C.D. Cal. 2024) *citing Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100-01 (2003).

including AIDEA.

95. The last factor is that the Court need not find bad faith on the part of the government to rule that the delay has been unreasonable. Based on the above factors, even in the absence of bad faith, the delay has certainly been unreasonable. However, based on the record before it this Court can and should consider making a finding of bad faith by the BLM.

<u>**COUNT I**</u>
<u>**The 2024 ANWR Lease Sale ROD Fails to Comply with the 2017 Tax Act, ANILCA, NEPA, and Multiple Other Federal Laws**</u>

96. Plaintiff incorporates the paragraphs above as if specifically alleged or pleaded herein.

97. The APA requires courts to "hold unlawful and set aside" agency action that is "not in accordance with law,"[116] and that is in "excess of statutory jurisdiction, authority or limitations, or short of statutory right."[117]

98. As set forth in detail above, the 2024 ANWR Lease Sale ROD is not in accordance with law and is in excess of BLM's statutory jurisdiction because it violates the text and purpose of the 2017 Tax Act and ANILCA as amended. As also set forth above, the 2024 ANWR Lease Sale ROD violates NEPA and the APA, for among other reasons, because BLM never offered the public the opportunity to comment on Alternative D-2.

---

[116] 5 U.S.C. § 706(2)(A).

[117] 5 U.S.C. § 706(2)(C).

Alternative D-2 was not included in the Draft SEIS on which BLM took public comment, was new to the Final SEIS, and differed in substantial ways from the alternative described in the Draft SEIS, yet nevertheless became the Preferred Alternative that BLM selected in the 2024 ANWR Lease Sale ROD.

99.     For these reasons, the 2024 ANWR Lease Sale ROD should be vacated as a violation of the APA both as contrary to law and outside BLM's statutory authority.

## COUNT II
## The 2024 ANWR Lease Sale ROD Is Arbitrary and Capricious

100.    Plaintiff incorporates the paragraphs above as if specifically alleged or pleaded herein.

101.    The APA requires courts to "hold unlawful and set aside" agency action that is "arbitrary," "capricious," or an "abuse of discretion."[118]

102.    As set forth in detail above, the 2024 ANWR Lease Sale ROD and 2024 SEIS are fundamentally flawed and not supported by evidence or reasoned decision-making. BLM erred in numerous ways including regurgitating acreage that was already validly leased, relying on acreage to lands BLM likely doesn't own, and implementing overly restrictive conditions.

103.    The 2024 ANWR Lease Sale ROD also represents an arbitrary, capricious, and wholly unfounded departure from how BLM first conducted its lease sale

---

[118] *Id.*

COMPLAINT

*Alaska Industrial Development & Export Authority v. Bureau of Land Management, et al.* Case No. 3:24:cv_____
Page **50** of 52

responsibilities under the 2017 Tax Act. It is a complete change in agency policy implemented without acknowledgement or sufficient explanation of the new policy.[119]

104. For these reasons, the 2024 ANWR Lease Sale ROD should be vacated under the APA as "arbitrary," "capricious," or an "abuse of discretion."[120]

## COUNT III
## Compelled Agency Action

105. Plaintiff incorporates the above paragraphs as if specifically alleged or pleaded herein.

106. For these reasons stated above, this court must compel BLM to conduct a lease sale that includes at least 400,000 acres of area not already leased and removes all unnecessary restrictions on leased acreage as it did for the 2020 ANWR Lease Sale.

## RELIEF REQUESTED

WHEREFORE, Plaintiff prays for the following relief:

1. An order declaring and adjudging that the 2024 ANWR Lease Sale ROD is legally flawed and invalid;

2. An order vacating and setting aside the 2024 ANWR Lease Sale ROD;

---

[119] *E.g.*, *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("To be sure, the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position. An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books.") (citation omitted, italics original).

[120] 5 U.S.C. § 706(2)(A).

COMPLAINT
*Alaska Industrial Development & Export Authority v. Bureau of Land Management*, *et al.* Case No. 3:24-cv_____
Page **51** of **52**

3.      Appropriate injunctive relief, including enjoining the Defendants from conducting any ANWR lease sale not in accord with the 2017 Tax Act;

4.      For an order declaring and adjudging that BLM must include in any lease sale the acreage with the highest concentration of economically developable hydrocarbon reserves;

5.      An award of all reasonable costs and attorneys' fees authorized by law;

6.      For such other relief as this Court deems just and equitable.

DATED this 20th day of December 2024, at Anchorage, Alaska

ASHBURN & MASON, P.C.

By:   s/*Matthew T. Findley*
         Matthew T. Findley
         Alaska Bar No. 0504009
         Michael S. Schechter
         Alaska Bar No. 1405044

Case 3:24-cv-00282     Document 1     Filed 12/20/24     Page 52 of 52